Brown, this is based on the document 2-14-081-1, speaking of the State of Illinois Vintage Athlete, the 20-3 Brown defendants are coming. I know on behalf of the defendants' firm, I will support the 10 call-outs. I know on behalf of the Vintage Athlete, Ms. Joan A. Kirkman. Sorry. All right. You may proceed. Good afternoon, your honors, counsel. You may please the court. My name is April Quintala, and I represent defendant appellant Quintise Brown on behalf of the Office of the State Appellate Defender. Your honors, there are three issues presented in this appeal. The first is a reasonable doubt insufficient evidence issue. The second is an ineffective assistance of counsel claim. And the third is a combination of statutory construction and one act, one crime principles involved. Could you pull the mic down just a little? Sure. Just so we can hear you. OK. OK. Thank you. Thank you. I'm going to focus on the first issue, which is the reasonable doubt insufficient evidence issue. And I'm obviously happy to answer any questions regarding the second and third issues as well. Your honors, Mr. Brown respectfully asked that this court reverse his convictions, because the state failed to prove beyond a reasonable doubt that he knowingly possessed the contraband that was found in the car in which he was a passenger at the time of his arrest. Even when viewing the evidence in the light most favorable to the state, no rational trier of fact could conclude that he knew of the existence of that contraband. There's two things that happened during the course of this arrest. First of all, he runs away. And we all know that flight has some consciousness of guilt. And the second thing is he's coming back. He says, look, whatever you find in that car, it's not mine. And maybe he had something. Whatever's in the glove box isn't mine either. Under the dash. Or under the dash. And they weren't looking particularly there. They were looking in the back seat and under the driver's seat. So why is he disclaiming all of these things? Your honor, so what's crucial with the flight and the statement in this case is the timing. So what you see when you watch the dash cam video and what you hear from Deputy Straw, who was the one who was actually searching the car, is that he was searching in the front driver's seat area. He had to stand on his knees on the pavement to see underneath the driver's seat. The gun was found directly underneath the driver's seat, according to Deputy Straw. The backpack that contained the drugs was found behind the driver's seat in the back of the car. So he was searching in the immediate area underneath the driver's seat and that front dash area. Where Mr. Brown is standing at that time is on the opposite side of the car on the sidewalk. So maybe five, six feet away. So he sees Deputy Straw go down on his knees searching underneath. He stands up. And then he says to Deputy McCullough, who's standing next to Mr. Brown, cuff him. It is only after Deputy Straw says, cuff him, that Mr. Brown runs away. And it's as he's being brought back to the scene that he says, whatever you found underneath the seat wasn't mine or under the dash. So breaking it down, you're saying this is like not unexplained flight. This is in reaction to the circumstance. Yes, Your Honor, exactly. The flight and the statement both took place after it has become apparent that something was found sufficient to have Deputy Straw say, cuff him. Let me ask you a technical question. If somebody says, whatever you find in the car is not mine, does that qualify as an admission under the law? What is that? Is that an admission? Not in this case, Your Honor. Again, because it was so apparent where Deputy Straw was searching, he said he was kneeling on the pavement looking underneath the driver's seat. So obviously, Mr. Brown can see what he's doing. He's standing on the sidewalk on the opposite side of the car seeing the search go on. But he's really making a disclaimer, if you will, on that admission, right? Exactly, Your Honor. I mean, he sees. For what it's worth. Right. Well, I mean, you have to keep in mind, too, that Mr. Brown also has a prior conviction for a possessory offense. So. Well, does he have any outstanding warrants pending? No, Your Honor. And I know nobody likes to be cuffed. I'll give you that one. But why is he going to run when they say, cuff him? Well, Your Honor, I think in this case, and especially given his history, he didn't want to be arrested for an offense he didn't commit. Clearly, something was found in the car. And he didn't want to be the one to go down for it when he was just getting a ride. All right. Well, let's then go back to before this all happened and when the police actually pulled the car over, took, was it Ms. Hill or I can't remember? Ms. Gills. Gills. Out of the car. He's still in the car. And from all reports, he's a very tall man. Yes. And it's not the biggest of cars. And he is, and I'll probably fall over backwards when I do this, he is as far back as the seat can be. In fact, they say the head of the seat is laying down on the back seat. The weapon that we're talking about is found on the passenger side of the driver's seat. It's in that well underneath the driver's seat on the passenger side as opposed to the door side. Yes, Your Honor. And the backpack, everybody can see. But if you look over there, and I'm not going to do it, he could have seen that gun. Your Honor, I would respectfully disagree with that. I do not believe that the gun in this case was in plain view. And I think that is a crucial fact. Well, not from over there, but from the way he's sitting. I mean, the officer is on the pavement, and he has to kneel down. I get that part. But essentially, your client is in the seat in a laying down position looking directly at the back seat. So why wouldn't he be able to see that? So Your Honor, going back to that four factor test of what you can infer knowledge from, the visibility of the contraband, that's crucial. Can we pin down one threshold thing? Sure. Possession can be one of two ways. It can be physical, which is actual, or it can be constructive. In this case, obviously, it would fall under the argument of constructive, correct? Yes, Your Honor. Yes. So in order to prove constructive possession, you've got to have knowledge and control. So this case really turns on knowledge. So whether or not the gun was visible is important to whether we can infer that Mr. Brown had knowledge. And based on the testimony, I do not think that you can infer that he had knowledge because the gun was not visible from where he was sitting. His position was such that he perhaps could have reached the gun or had control of it in that way. But Deputy Straw testified not only that the gun was directly underneath the driver's seat and that he had to stand on his knees in order to see it underneath there. He also said that when they were taking the pictures of where the gun was located, that he wouldn't be able to see the gun without the seat being moved push forward. So he said the seat had to be moved forward in order for the gun to be visible as it's photographed. And you can see particularly in Exhibit 13, the gun was small. It was about the same size as the CD and the hairbrush that were sitting next to it. So there was other debris back there near the back of the driver's seat and underneath of it. It was also a dark gun sitting on dark black or gray carpeting. So that distinguishes this case from a case like People v. Ingram, where- Why does this tie into what Justice Hutchinson did now as you alluded to? What you're saying would be the case. I mean, he couldn't see it, but that wouldn't exclude constructive possession if the argument is he put it there. And as she was pointing out, it was between the drivers and passengers. It would be very difficult to maintain that he had possession to put it there if it was on the driver's side by the driver's door. That's true. This is still within his reach. Is it not? Your Honor, I would agree that for a 6 foot 4 man in a reclined position, yes, it probably would have been within his reach. However, going back to that four factor test, there was no report that Mr. Brown was moving around in any way that would suggest that he was trying to hide or retrieve contraband within the car. Is there any testimony of any movement within the passenger compartment of the car? No, Your Honor. And when you watch the video, I mean, he's sitting there in the passenger seat for about 10 minutes before he's asked to get out of the car. And there's nothing that you can see, obviously, from the video. And none of the three deputies who were present testified that there were any furtive movements or questionable gestures going on while he was seated in the car. It's also important, I think, that Mr. Brown gave his real name, gave his real ID, and that of all three of the deputies who were present for the stop, none of them knew whether or not any fingerprints had been taken from any of the contraband found in the car. So the gun, the backpack, any of the items found in the backpack, there was no fingerprint evidence tying Mr. Brown to any of those items. And where it's unclear whether or not there was even an attempt made to obtain fingerprints, I think that it's fair to infer that if such an attempt was made, it was unsuccessful. That's similar to People v. Bailey. It was probative in that case that there was no fingerprint evidence, even though the defendant said, hey, you might find my fingerprints on the gun. So in this situation, I think that it's really crucial that the gun was not in plain view. And that's by all accounts. You can see it in Exhibit 13 that the gun was not very large. It was not easy to see. It wasn't sitting in stark relief against red carpeting as it was in People v. Ingram. That is not the case here. It was very dark. It was the middle of the night. And I do not think you can infer that it was in plain view. Same goes for the backpack. There's no indication the backpack was open, that any of the contents were visible. There was no indicia of ownership found within the backpack. And Deputy Straw actually didn't discover the contents of the backpack until after Mr. Brown had been searched, put in the squad car, and he was completing the inventory search of the car. You can see where the drugs within the backpack are found. It's about 109.49 in the dash cam video. Although, so about 30 minutes into the video is the contents of the backpack are discovered. Did he deny that it was his backpack? There was never any question asked of him as to whether it was or was not his backpack. So he made no statement regarding the backpack whatsoever. And it was long after the gun had been recovered that the contents of the backpack were discovered. Did Ms. Gill ever testify? She did not, Your Honor. And they were doing an inventory search of this car because she was going to be arrested, I assume, for DUI and maybe going over the line or something. And he was never offered the opportunity to drive, was he? No, Your Honor. There was no indication he had any control of the car at any time. So the registered owner was a man named Richard Overton. Ms. Gill was the driver. And it's clear listening to some of the audio in the video that there was suspended license situations going on and things like that. But it's also clear from the record that the jury never heard the audio for the video. So setting all of that aside, I also think the jury only probably saw about 20 minutes of the video because that's all the state referenced in their closing argument. All right, now let's look at something you just said. The car is owned by Mr. Overton but driven by another person, not an owner. And she has a passenger. There is a gun ultimately found. When the defendant is searched, he has a fair amount of cash on his person, but he's unemployed. I know there's been an argument about the fact that he has a cell phone. And Mr. Glazier and Ms. Gripke had some motions that were directed at that earlier on. And he takes off. And drugs are ultimately found. There's testimony that persons involved in delivery situations don't often drive their own car because of forfeiture issues or other issues. And people who are unemployed don't usually have $750 or so in smaller bills in their possession. When you're putting all of this information together and there is testimony from a person about what this could mean, what he believes this means, why couldn't the jury infer that he was, in fact, controlling those with the intent to deliver and that the gun that he constructively possessed that gun? Your Honor, I think that brings up an important point that what is necessary to show knowledge is not the same as what's necessary to show control. And again, what's necessary to show intent to deliver is not the same thing that's necessary to show knowledge or control. So a defendant must first have possession of a controlled substance before they can intend to deliver it. So that there's circumstantial evidence of intent to deliver, like money and a cell phone. In some cases, you could infer an intent from that. But I would posit that you can't infer knowledge on the basis of possessing two things that are completely benign on their own. Take a controlled substance out of the car, and who cares if someone has cash and a cell phone? That's a benign thing to possess. It's only if a person possesses a controlled substance that those things become relevant. Well, I'll go back to that issue. OK, we talked about constructive possession. I know the defendant notes that Ms. Gills had access to the same items. It's true. Let's assume that was true. Isn't there such a thing under the law that can't constructive possession be joint? Does it have to be can't two people in a car jointly possess cash and debt? They can, Your Honor. So why would that argument carry the case? Well, so first of all, the situation with Ms. Gills is different. You have to infer knowledge and control from different things.  that she having ownership or regular access to a vehicle, you can infer knowledge just on that basis. So the fact that this is a car that she's driving and obviously has access to, there's a different basis on which you can infer her knowledge. In Mr. Brown's case, I mean, it could be a joint possession situation. But again, it comes back to whether or not he knew the contraband was there. If the gun wasn't visible, if it was small and difficult to see, if he didn't have any gestures or furtive movements suggesting that she had the gun, he didn't put it there. I mean, I understand your theory. You know, you're saying, well, she put the gun in the car. He's being tagged in that knowledge only if he saw the gun there. Is that the only way he would be responsible, if he saw it? Could it be an argument that he had put it there? Your Honor, I don't, it depends whether or not you can infer that he knew that it was there at all. He could theoretically have put it there. She could have put it there. The owner of the car could have put it there. The question is, when you're merely a passenger in a car that you have no regular or ongoing control over, no ownership interest, and no apparent connection to the person who has the ownership interest, then how do we infer knowledge under those circumstances? Well, you'd have to go with the proximity. You're right. You'd have to go with the totality of the circumstances you've done the job of outlining. Was he driving the car before? Is there any evidence he was a regular passenger in the car? But how do you ever ascertain knowledge? How does the trier effect ever ascertain knowledge? It's inferred. You're never going to know what's in somebody's mind at any given point in time, correct? Correct, Your Honor. And yes, circumstantial evidence is what you need to look at in order to decide whether or not it's reasonable to infer knowledge. And I would argue that under the totality of the circumstances here, applying that four-factor test, you do not have proof of knowledge. So you would have to, the hurdle to overcome, as you know, is whether a rational trier effect. So you will have to convince us that no rational trier effect could infer possession, right? Yes, Your Honor. OK. I do have one question that I want to ask you, even though I know your time has expired. The state has agreed that certain convictions should have been merged, and certain ones were merged at sentencing. The fact remains that we still have two-armed violence convictions standing. Is it your position that they should stand, or should one of them be dismissed? Your Honor, it's our position that one of those two counts of armed violence should be dismissed. And then whichever counts would stand, the two of the three possessory offenses that serve as the predicates for that armed violence conviction should also be vacated. And why should one of the two be dismissed? Your Honor, we're basing that off of people versus white. The issue is that the armed violence statute's language is ambiguous to the extent that the rule of lenity leads us to the conclusion that the term any felony does not permit multiple armed violence convictions for the simultaneous commission of different predicate offenses. And that was the holding in white? Yes, Your Honor. OK, we'll see if the state can distinguish that. And the issue here is they were both, what, possessions of something? It was all simultaneous possessions, Your Honor, yes. And so the more serious, if we were to grant your request, the more serious of the two would stand, right? Yes, Your Honor. Again, probably? Probably, yes, Your Honor. OK. Any questions? Thank you very much. You'll have an opportunity for reply. Thank you. Ms. Kripke. Good afternoon. General Kripke, on behalf of the people of the State of Illinois Council. Before I sit down, I do want to address the issue of the armed violence. Do you want me to address that first? Or do whatever you want to do. But we will want you to address it before you address it. OK. So there were a couple of comments that counsel made during her argument that I disagree with. There were several times where she said, well, there was no testimonies to this. Therefore, we can infer that such and such happened. For example, she said, well, there weren't any finger, we don't know anything about the fingerprint evidence. Therefore, we have to infer that there wasn't anything that could implicate the defendant. If there's no evidence, you don't get to infer anything. All you know is there's no fingerprint evidence. It doesn't mean that the person there wasn't, that his fingerprints were there or weren't there. We don't know why there was no fingerprint evidence. And there were a couple of different pieces of evidence which counsel made that conclusion. And I think that when evidence is not there, the evidence simply isn't there. You don't get to infer why this guy ran. So you're saying we should apply the McLaren-Maxim that you frequently opine. Absence of evidence is not evidence of absence. Is that what you're saying? See, this one, I mean, I missed his, I wasn't sure. He said absence in Italian, or in Latin. Absence of evidence is not evidence of absence is what you're saying. Yes. OK. Do we know why there? We know why he says it. Oh, no. No, no. Do we know anything about fingerprints? I think there wasn't any fingerprint evidence. I don't even recall. I think that the, I know that people prove this man guilty beyond a reasonable doubt. First of all, there not only was there exclusive control over the contraband in the car, because he was alone in that car for at least 10 minutes, but there was also, it also could possibly be joint. It could be based on maybe the lady of it. Why are you saying it was exclusive? When the car was stopped, there were two people in it, correct? The driver and the defect? Right. Correct. So what was the exclusivity coming in from? Exclusivity was because they took her out of the car because she was intoxicated, and they wanted to do the field test. And he sat in that car for 10 minutes all by himself. So he had exclusive control over that car for at least 10 minutes. You can certainly argue that, but when I asked her, she said that they didn't observe. The cops had him in view the whole time. They didn't observe any movements or furtive movements. That's another inference. There's no discussion of that in the evidence at all. There's simply no testimony. So you can't say that they didn't, there's no, they didn't say that there weren't any furtive movements. No one testified about what the, no one was asked, what was the defendant doing while you were searching the car, while you were processing the intoxicated, the driver. There was just no testimony about it. So you can't say that there were, you can't make that argument that there were no furtive movements. Was there any dash cam access to the car while he was there by himself? Because he's busy with someone else. Right, and you really can't, I think it's, I watched the entire video, and you really can't see. I'm not even sure you can see him, which if you want to infer something then, then you're going to have to infer that the man was behind in that chair and he had, with his long arms, being that he's 6'4", had access to the gun. And one thing that I want to point out about the gun was that the barrel was facing forward and the grip was facing backward, and you can see that in the picture. So if you have a gun in your hand, most people don't grab a gun. Well, I would presume that's what you're handling. I would not handle a guy by holding a loaded gun and pointing the barrel at myself. I would hold it by the grip and put it forward. If the driver had put that gun under the seat, one would imagine that she would have put it with the barrel facing. That's a difference, isn't it? Right. She could have moved the seat up first and then tucked it in. But I'm talking about the direction of the way the barrel was facing. If she pushes the seat up, reaches in the back seat, and puts it down. I mean, we're all making inferences. You argue that counsel shouldn't make inferences about what isn't there. So we don't know how the gun got there or who put it there. But there is exclusive possession. So your position is if two people are in a car and the driver gets yanked out of the car to do a field sobriety test, sua sponte, the guy that's left in the car now, has exclusive control over everything in the car, whether they knew or didn't know about it? Why not? No. But she's never going to get in the car with someone again. Or let them get out. Yeah, no, he can't get out of the car. I mean, you're saying because he was in the car alone, that's what generates control? Yes. Okay. But that's not what he was convicted on. That's not. But he had control. That wasn't the argument the state made to the court, that he was in that car for 10 minutes, so he had exclusive control. They argued that based upon his position, based upon the car's ownership, based upon other things, including the $750 in his pocket, being unemployed, that he knew that it was there, or he had reason to know. Yes, ma'am. It wasn't because he was in that car 10 minutes by himself. That's just one factor. That's just one factor. But we have to talk about the possession of it. He didn't have it. We have to talk about how he can say that he had possession of the thing, of the gun or the drugs. They weren't on his purse. It's constructed. It doesn't have to be actual. It can be constructed. Exactly. So you have to say that he was alone in that car, so therefore he had constructed possession of the car. Being alone wouldn't be enough. As you know, there's two elements. There's control and there's the intent to exercise control. Correct. There is no law that says you, when you step into a vehicle, you're automatically in control of everything in the vehicle? No, but he had the ability, because the seat was slid back and the backrest was back. Circumstances make your argument that it's constructed possession, right. But we still have to have the intent mental element. Well, I would still go back to the fact that he fled, the fact that he only became really interested in the search at the time the deputy was searching underneath the seat, because the deputy, if you look at the video, he's searching first in front of the car, in front of the seat, where your legs go, where the driver's legs would go. And this guy was leaning back against the railing on the street and he wasn't actively involved in looking at it. You can actually see him move forward and start looking toward the deputy and the deputy said he looked nervous while that was going on. And second of all, he ran. And flight is always an indicator of a consciousness of guilt. And he came back and made this omission, this bizarre statement saying, nothing, anything you found under the seat isn't mine. And then he said, or under the dash, because I think adding or under the dash, he realized that he had just implicated himself by saying anything under the seat, because he knew there was something under the seat. And why? Because he put it there. He put the gun there. And again, we don't know why he ran. We can't say it's because he had a former possession, which is not something that was in evidence at the time of the trial and that type of information shouldn't be discussed at this point while we're discussing the evidence that was before the trial or a fact. We don't know what was on his mind. We can't say that he didn't want to be arrested for this reason or that reason. We simply don't know. That's information that was simply not in evidence and nothing that was put forward to the jury. And that's information that came in at sentencing. It does not belong before, it wasn't before the trial court, and it doesn't belong in an argument before this court about what the trial or fact found below. What about the multiple convictions? I mean, how do you get around the White case? This is how... I'm curious. Oh, okay. So while we're looking, we do appreciate the confession that certain things should have been otherwise dealt with, but, you know, in terms of merging and multiple offenses, but... Okay, this is how I look at the White case again, and what they said was the language, any, is ambiguous. Any means one felony or can mean multiple felonies. And ambiguity, you err in favor of the defendant. So I looked up any in Black's Law Dictionary, which doesn't help, because, again, it says it's one or some. So then what I did was I looked up... I just did this this morning. I started to look at the use of the word any in all Illinois statutes. I just put it in as a Westlaw search, and what I came up with was lots and lots of statutes that use the word any. I have several cards. I can cite them to you if you want, the different sites, but this is how the Illinois Compiled Statutes uses the word any. For example, when they're only referring to one whatever, they use... These are the four statutes having to do with higher education and the powers involved in higher education, and those statutes read any one project or more than one or any combination thereof. And all the statutes, when they only want to indicate that any means one, they say any one fill in the blank. And this statute does not say any one. It says any felony. And I would argue that based on the usage of the word any, throughout all these statutes in the Illinois Compiled Statutes, any can mean multiple felonies. And therefore, yes, the trial judge was correct. Do you have any examples where the use of the word any alone meant many? I didn't find any. So we would have to infer that the absence of... You would have to do... I would be happy to do further research on it because, as I said, I was doing it this morning. Well, we're all familiar with the case, and for the life of me, the name of it escapes me now. Involving the Farm Act. Do we remember that name? Farm Act? Yeah, it's going to come up very quickly. Okay, fine. Probably not. But the Supreme Court said any means any. It's a big term. And although it's a civil case, it was broad enough to encompass a lot of things. And so even if it's civil, And we'll tell you the name of the case when we remember it. It involves... It involves horseflies. Yeah, horseflies. Yeah, look up horseflies. Horseflies? Yeah. But that's not important. But any, they said, is very broad, and it could be, and it is ambiguous, and it should be taken to mean, well, in a criminal situation, I would say that case means it should be taken to, if it is ambiguous, to give to the defendant the benefit of the doubt. It's the rule of lenity, right? Sorry? Does that fall under the rule of lenity? That's essentially it. That's the rule of lenity, but I'm suggesting that you look at the use of the word, that that's the Supreme Court saying that, but I'm saying look at how the Illinois Compiled Statutes uses the word any. Well, there, I mean, this is a, it's part of the Illinois Compiled Statutes. But you also have to look at when they've used it, when it was amended, because we have had sessions where there have been lawyers in the legislature. We have had sessions when lawyers are almost forbidden from being in the sessions. You know, they haven't been elected because people don't like lawyers. Really? I don't know. Many sessions, you know, many sessions of the legislature didn't care what judges said about their language, but when the Supreme Court says this is what it means, that's what we have to abide by, not what the legislature particularly has said. And I only, I mention that because it is an ambiguous term. It's ambiguous except where it's not. And I would argue that when they only, when the Illinois Compiled Statutes are written and they want to have only one whatever followed, then they say any one. So you're saying it's the Compiled Statutes, the argument is that it's a matter of statutory interpretation. Yes. What does the legislature mean? Yes. Depending on the context of the statute. Yes, yes. And so the other thing, though, with the multiple convictions is, and this has happened many times before, our position is that you don't want, that we don't want those other convictions vacated. Because if you vacate the lesser conviction, once we get into post-conviction land and we lose the greater, and the possibility that we lose the greater conviction, there's nothing left. But here isn't the, there's no issue about the habitual criminal. Excuse me? The habitual criminals. They have one stance. They have one stance, but I'm just talking in general. The difference between vacating something and merging, vacating a conviction versus merging a conviction. I'm not saying. Two should merge into one. That's your position. I'm saying that you don't want the underlying conviction to be vacated. Because if it's vacated, it no longer exists. It merges. You're not having a second sentence on it. You're just merging them and saying one is subsumed by the other. But if you vacated, then the conviction goes away. But if we, if there was a vacating in this case, the more serious conviction would stand, and the cannabis possession would be the one that should be vacated. No. Because the more serious one is the cocaine. It carries the more serious penalties. Let's say there's two armed violences and both of them are gone, and now you've vacated the lower possession ones. Then what? Why would we get rid of both of them? Because I don't know what will happen on post-conviction down the line, five years from now, when these cases come back and people are going, well, look at here. And then they raise some issue and convictions go away. Well, we'll be here probably. We'll try to remember if that's what happens. We'll take a word on that one. For these reasons, we believe the people proved the defendant guilty beyond a reasonable doubt, that there was no ineffective assistance of counsel. We ask you to affirm the convictions and to affirm both armed violence convictions. Thank you. Ms. Campala. Thank you, Your Honors. One thing I just want to get out of the way right away here is that the prior conviction in this case was in evidence. I believe it was People's Exhibits 20 and 21, in order to prove up the armed habitual criminal offense. Well, it had to be for sentencing. It was certified copies of conviction were presented at trial. In addition, Your Honor, regarding the fingerprint issue, the fact that there was no evidence regarding the fingerprints, this is from People v. Jackson. Where the record does not disclose whether an attempt was made to obtain fingerprint evidence, it is a fair inference that if such an attempt was made, it was unsuccessful. So I am not saying that – So this case was backed up, Your Honor. Yes, Your Honor. All three deputies testified that they did not know whether any of the contraband had been tested for fingerprints. And my argument is that it's fair to infer that if such an attempt was made, it was unsuccessful in this case. With regard to the request to vacate one of the armed violence convictions. Yes, Your Honor. You relied on White. We noticed that from the brief. But what about her argument that White's wrong and good, but she's looking at the interpretation of any in different contexts? So I take it you didn't do an exhaustive search of the term any? I didn't, Your Honor. But I did go back to People v. Carter, which is what White relied on in coming to its conclusion that any can be read as singular or plural in this context. And the rule of lenity dictates that, you know, we have to read it as plural in this case. So the Illinois Supreme Court's reasoning in Carter was that the use of the term any, as it applied to, I believe it was unlawful use of a weapon, it was another gun type of offense, that there was no allowable unit of prosecution defined because that term any was used. I would liken this, well, I think that the whole issue of merging convictions, I think that's separate from what we're arguing with regard to the armed violence convictions in particular. That's an issue of statutory construction. The merging convictions only comes up when you start looking at those predicate offenses. And it's our position that to merge convictions means to vacate some convictions based on the same acts underlying different offenses. Back up. Want to say that again? Sure. Your suggestion is that vacating is the same as merging? So when you merge convictions under one act, one crime principle, that is vacating convictions of a particular offense based upon the same physical act as other convictions of the same offense. A finding of guilt is not a conviction. A conviction necessarily contemplates a sentence. So if there's no sentence for the offense because of one act, one crime principles, there is no conviction. That's why you vacate the conviction. But that is separate from the issue of the armed violence, whether one of the armed violence convictions should be vacated. That's an issue of statutory construction. And you're suggesting if it's vacated, we vacate the sentence, we vacate the entire thing. Well, let's take the state's argument. Say we vacate count two, which I know you don't have in front of you. That was the cannabis one. We let the cocaine or the armed violence based on the possession of cocaine stand. Five years from now, for whatever reason, post-conviction is granted and that is vacated. Is count two resurrected? Well, Your Honor, if there was a finding of guilt on count two, then I would suggest that it could be under those circumstances. But it was vacated. How does it own an act? Well, there's no sentence associated with it. But there was still a finding of guilt. So for whatever reason. That's my question. Right. Okay. We have two counts, two findings of guilty, two judgments of conviction were entered, two sentences entered. Now, if we vacate all of count two, count one is later vacated on a post-conviction. Can count two be resurrected? Yes or no? I believe that it could, yes. Based on what? It's an analogy. I don't expect you to pull a case out of your ear. Well, just thinking about it logically, if there's two findings of guilt, and the whole reason why we're saying that one of the two armed violence convictions should be vacated is because the statute does not support multiple armed violence convictions where they're predicated on simultaneously occurring predicate felonies. If the multiple part goes away, then whatever other armed violence findings of guilt existed, then sentence should be imposed on that. So we have contingent convictions, contingent on something that happens five years down the road. I mean, if you could enter the convictions, oh, you can't. And if they're vacated, you might have a point. I don't know how you can automatically reinstate something five years later. That could very well be the case, Your Honor. It strikes me as sort of an ad hoc concept. I mean, what you're saying does have, oh, I almost said it. You weren't going to say that. No, I wasn't. It does make some sense. But then there's this other issue of that case is long gone. There's a jurisdiction issue. How do we go back and grab it? And I don't expect you to answer that, but that would be a second issue that would come up on such a case. So you ought to do some research on your own sometime. You're welcome to do that. Yes, Your Honor. It's my understanding that there can be no conviction without a sentence, and where the sentence should not be imposed, then there cannot be a conviction. May I briefly conclude? Yes. Your Honors, Mr. Brown respectfully asks that you reverse his convictions in this case. Alternatively, that you vacate one of the two armed violence convictions as well as two of the three predicate offenses for whichever armed violence conviction was stamped. Thank you, Your Honor. All right, counsel. Thank you very much for your arguments today. We do appreciate them, and we appreciate the extra effort in getting ready for that particular little issue, or large issue. We will take the matter under advisement, render a decision, and we now stand adjourned for the day. Thank you. Thanks.